## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF NEW YORK

---

CODY A. KIMBALL,

                              Plaintiff,

              -vs-                                    DECISION AND ORDER

VILLAGE OF PAINTED POST, DONALD YOST,                 12-CV-6275-CJS-MWP
ROBERT HALM *in his Individual and Official Capaci-*
*ty as Chief of Police*, MAYOR FRANKLIN, OFFICER
TODD KIMMEY, and JOHN & JANE DOES,

                              Defendants.

---

## APPEARANCES

For Plaintiff:                          A.J. Bosman, Esq.
                                        Bosman Law Firm, LLC
                                        6599 Martin Street
                                        Rome, NY 13440
                                        (315) 336-9130

For Village of Painted Post, Robert     Jeremy J. Hourihan, Esq.
Halm, Mayor Franklin, Officer Todd      Pamela Doyle Gee, Esq.
Kimmey, and John & Jane Does:           Hiscock & Barclay LLP
                                        243 Lake Street
                                        Elmira, NY 14901
                                        (607) 398-3707

For Donald Yost:                        James Scott Wolford**,** Esq.
                                        Sarah Snyder Merkel, Esq.
                                        The Wolford Law Firm LLP
                                        16 East Main Street
                                        600 Reynolds Arcade Building
                                        Rochester, NY 14614
                                        585-325-8015

## INTRODUCTION

**Siragusa, J.** This employment discrimination case is before the Court on motions

by Defendants seeking summary judgment. Motion for summary judgment by Donald

Yost, March 2, 2015, ECF No. 32 ("Yost motion"); motion for summary judgment by Robert Halm, Mayor Franklin, Officer Todd Kimmey, Village of Painted Post, Mar. 2, 2015, ECF No. 33 ("Village motion"). For the reasons stated below, both applications are granted.

## BACKGROUND

The facts for the purpose of these motions is taken from the parties' statements filed pursuant to Loc. R. Civ. P. 56. Disputes are indicated below.

### *Plaintiff Attends the Police Academy and Works Part-Time for the Village of Painted Post Police Department*

Plaintiff Cody A. Kimball ("Plaintiff")[1] began working part-time for the Village of Painted Post Police Department ("Police Department") in 1995. The parties dispute when she left the department's employment, with Plaintiff asserting it was in 1998, and Defendants contending she resigned on February 12, 1997.[2] Plaintiff was an intern with the Police Department in 1994 in connection with work she was required to do for her training in the police academy. Plaintiff completed her training in 1994 and the following year began working part-time at the Cortland County Sheriff's Department as an undercover narcotics officer, and also worked part-time as an officer with the Police Department. She left her employment with the Police Department in 1998 due to illness. Plaintiff adds that she worked shift coverage for two officers beginning in 2002, and although she did not receive benefits, she did receive overtime pay when she exceeded forty hours.

---

[1] Plaintiff states that her current name is Cody A. Cook, and that was her name at the time she worked for Defendants. Pl.'s Combined Response to Defendants' Statement of Material Facts, As and For a Responsive Statement of Material Facts to Defendant Yost's Motion for Summary Judgment, ¶ 2, Apr. 27, 2015, ECF No. 38 ("Pl's Statement").

[2] This dispute may arise from a typographical error. Later in their statements of facts, the parties agree on June 25, 2008, as the date of Kimball's resignation.

### Plaintiff Works Full Time for the Police Department

On May 12, 2005, Plaintiff made a lateral transfer from the Steuben County Sheriff's Department to the Painted Post Police department. Prior to May 12, 2005, Plaintiff had no issues working with Donald Yost ("Yost"), then chief of the department, who had been appointed in June 1976.

### Plaintiff's Complaints Against the Police Department

In October 2006, Plaintiff complained to Union President Todd Kimmey ("Kimmey") and other Village officials that Yost used disparaging language. In her response to Defendants' statements of fact, Plaintiff added that Yost also choked her, shoved her up against a cabinet, and pushed his knee into her crotch. Plaintiff complained to the New York Union of Police Associates, Inc., to Kimmey, and to Barbara Clark, the town clerk, who advised her to contact Mayor Franklin, which Plaintiff did. Within ten days of receiving notice of Plaintiff's complaint, the Village trustees called a special meeting to discuss an appropriate course of action. Plaintiff asserts that she was not invited to participate in that meeting.

### Yost Retires and Is Made a Consultant

The Village attorney, Ronald Yorio, advised the trustees that he had spoken with Plaintiff, the union attorney, Marilyn Berson, and Yost, and that if Yost retired, that would resolve the issue. Subsequently, on December 31, 2006, Yost did in fact retire. Defendants state that Yost agreed to make himself available as a consultant on an as needed basis for the Village Board for a period of three years, and in return, received a monthly stipend of $1,400.00. Mayor Franklin stated that "consultant as needed" meant that if the new police chief needed information from previous years, he could contact Yost for that information. Yost's buyout provided him with additional income since he

was retiring early at age 62, and would not be eligible for Medicare or Social Security benefits until he reached age 65.

Plaintiff disputes that Yost actually retired, and asserts instead that Yost was continually employed by the Village as a paid consultant. Plaintiff further states she was unaware that the Village trustees had offered Yost the consulting position and further states that Yost had daily access to the police department building until the locks were changed in March 2007. Additionally, Plaintiff asserts that Yost was permitted to use "the police scanner, and other privileges which allowed Yost to continue his harassment of Plaitniff [sic]." Pl.'s Statement ¶ 7.

Plaintiff contends that Yost's consulting services utilized by the police department and that Yost's buyout agreement was actually an employment agreement. However, Yost testified at a pretrial deposition that following his retirement on December 31, 2006, neither the Village Board, nor the Police Department, made any requests for his consulting services. Yost Dep. 16:16–23, Apr. 27, 2015, ECF No. 41. Plaintiff admits that after Spring of 2007, Yost and she did not have any verbal interaction; however, she maintains that "Yost continued to interact with Plaintiff in a fashion intended to intim-idate and retaliate against Plaintiff for reporting his unlawful treatment of her." Pl.'s Statement ¶ 16. After his retirement, Yost did not set Plaintiff's pay, have input into her evaluations, or exercise any supervisory role over her. However, Plaintiff asserts in her response that Yost continued to harass her. Robert Halm ("Halm") became the Chief of the Village of Painted Post Police Department on January 1, 2007.

### Plaintiff's Counseling

On September 9, 2007, Plaintiff was absent from work without leave and was is-sued a counseling memorandum as a result. On December 21, 2007, Plaintiff received

a written reprimand as a result of a one-car accident in a patrol car, which occurred on December 1, 2007. She received no further discipline for the accident. Plaintiff adds that at the time she asked her passenger, Kimmey, if she was clear to back up, and he gave her an affirmative response, for which *he* was not reprimanded. Plaintiff also received a counseling memorandum for leaving a fork in a patrol car, and, according to Plaintiff, she was docked one vacation day. The parties dispute whether Patrolman Dean Swan ("Swan") received a counseling memorandum on May 30, 2008, for leaving a folding knife in a patrol car. The parties agree that Swan also received a written reprimand on February 4, 2009, regarding an accident involving a patrol vehicle. Plaintiff further adds that the counseling memorandum of March 30, 2008, was not issued until seven months after she departed from the police department, and that its issuance took place five months after she filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC").

### *Pornography Viewing*

In 2007, and in 2008, Plaintiff stated to Halm that she believed pornography was being viewed on the Police Department computers. Defendants' statement of facts lists only two times that Plaintiff complained; however, Plaintiff responds that she made many more complaints to Yost, Kimmey, the district attorney, and others. Halm issued in interoffice memorandum regarding computer usage and subsequently limited access to the computers by instituting passwords, which were supplied to the officers upon request. Plaintiff adds that Defendants delayed in issuing her a password, but not to her male coworkers, and that her male coworkers continued to visit pornography sites using their newly issued passwords. Plaintiff further alleges that she was required to write a memorandum explaining why she went outside the chain of command to the district at-

torney when complaining about the viewing of pornographic material on the depart-
ment's computers.

### Plaintiff's Pay Issues and General Release

Plaintiff also complained to the Village Clerk and Halm about her pay. Defend-
ants assert that they continuously attempted to remedy the issue. Plaintiff retorts that
she complained to others as well, including the Village attorney and the union attorney,
and that Kimmey told her to "shut up and take your pay." *Id.* ¶ 18. Plaintiff also asserts
that she complained that the "Village of Painted Post" was not properly reporting her
hours worked to the New York State Retirement System, and the Municipal Police
Training Counsel. Kimball Dep. 84:6–9; Cook Aff. ¶ 13, Apr. 27, 2015, ECF No. 37. On
or about May 12, 2008, Plaintiff signed a general release and accepted $1,250.00 in ex-
change for releasing the Village of Painted Post for any liability related to past claims for
wages and benefits as a Village employee. Plaintiff asserts that she was presented with
the general release following her discharge from the hospital and while still under the
influence of her prescription. She further contends that she does not even remember
signing the general release, that she was not represented by counsel at that time, and
that the only people present in addition to her were Village Attorney Ron Yorio, and
Plaintiff's mother. Plaintiff asserts that she revoked the agreement once she was no
longer on medication and was able to speak with her attorney. However, she admits she
never returned it to the Village of Painted Post and instead kept the $1,250.00 in a sep-
arate, interest-bearing account which she HAS not accessed. The parties also dispute
when Plaintiff was released from Inova Alexandria Hospital. Defendants contended the
hospital release date was May 8, 2008, and Plaintiff states it was May 9, 2008.

***Plaintiff Ends Her Employment with the Police Department***

The parties do not dispute the Plaintiff resigned from the Police Department on June 25, 2008. Plaintiff, however, claims that her resignation was a constructive termination. Compl. ¶ 9.

In July 2008, Plaintiff accepted employment with Conquest Seismic Services ("Conquest") and worked there until approximately May 2009. During her tenure at the Police Department, Plaintiff's salary was approximately $36,000. Conquest, however, paid her an annual salary of approximately $54,000. Plaintiff testified that while employed with Conquest, was on the road for over a year, traveling around the United States and Canada. Kimball Dep. 12:11–15. Consequently, Defendants argue she could not have seen Yost following her from July 2008 until May 2009. Def. Mem. of Law at 9 n.6, Mar. 2, 2015, ECF No. 32-20.

***EEOC Complaints***

On August 11, 2008, Plaintiff's former counsel wrote a letter to the EEOC alleging sex discrimination by the Village of Painted Post. According to Plaintiff, the letter also alleged violations of equal pay and a hostile work environment. The August EEOC letter was not served on Yost or the Village.

On or about September 9, 2008, Plaintiff filed an amended charge of discrimination with the EEOC against the Village of Painted Post, alleging discrimination on the basis of sex, and equal pay. The amended charge also included a claim of retaliation. Yost was not named as a respondent. Counsel for the police department submitted a response to the charge on October 9, 2008, without contacting Yost. The EEOC issued a right to sue letter on or about February 23, 2012, after determining that it was unable to conclude there was a violation of Federal law.

***Plaintiff's Federal Complaint***

Plaintiff filed her complaint against Defendants in this Court on May 21, 2012, ECF No. 1. In it, she raises four causes of action as follows:

(1) Against the Village of Painted Post, Plaintiff alleges that it violated her rights under Title VII by discriminating against her on the basis of gender;

(2) Against the Village of Painted Post, Plaintiff alleges that after complaining of gender discrimination, she was subjected to retaliation in violation of Title VII;

(3) Against all Defendants, Plaintiff alleges discrimination pursuant to the New York State Human Rights Law ("NYSHRL");

(4) Against all Defendants, Plaintiff alleges retaliation pursuant to the NYSHRL.

Following oral argument on June 18, 2015, the parties, at the Court's invitation, submitted further letter memoranda of law pertaining to the statute of limitations question and any other evidence already filed in the case, which the Court has considered.

## STANDARDS OF LAW

***Summary Judgment Motion***

Summary judgment may not be granted unless "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). A party seeking summary judgment bears the burden of establishing that no genuine issue of material fact exists. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S. Ct. 1598, 26 L. Ed. 2d 142 (1970). "[T]he movant must make a prima facie showing that the standard for obtaining summary judgment has been satisfied." 11 Moore's Federal Practice § 56.11[1][a] (Matthew Bender 3d ed.). "In moving for summary judgment against a party who will bear

the ultimate burden of proof at trial, the movant may satisfy this burden by pointing to an absence of evidence to support an essential element of the nonmoving party's claim." *Gummo v. Village of Depew*, 75 F.3d 98, 107 (2d Cir. 1996) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)), *cert. denied*, 517 U.S. 1190, 116 S. Ct. 1678, 134 L. Ed. 2d 780 (1996).

The burden then shifts to the non-moving party to demonstrate specific facts showing that there is a genuine issue for trial. Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). To do this, the non-moving party must present evidence sufficient to support a jury verdict in its favor. Anderson, 477 U.S. at 249. "[F]actual issues created solely by an affidavit crafted to oppose a summary judgment motion are not 'genuine' issues for trial." *Hayes v. N.Y. City Dep't of Corr.*, 84 F.3d 614, 619 (2d Cir. 1996). Summary judgment is appropriate only where, "after drawing all reasonable inferences in favor of the party against whom summary judgment is sought, no reasonable trier of fact could find in favor of the non-moving party." *Leon v. Murphy*, 988 F.2d 303, 308 (2d Cir. 1993). The parties may only carry their respective burdens by producing evidentiary proof in admissible form. Fed. R. Civ. P. 56(c)(1)(B). The underlying facts contained in affidavits, attached exhibits, and depositions, must be viewed in the light most favorable to the non-moving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S. Ct. 993, 8 L. Ed. 2d 176 (1962).

### Title VII

Title VII "makes it unlawful for an employer to discriminate against any individual with respect to the 'compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin.' 42 U.S.C.

§ 2000e-2(a)(1)." *Richardson v. New York State Dep't of Correctional Serv.*, 180 F.3d 426, 436 (2d Cir. 1999).

### New York Human Rights Law

New York Executive Law § 296 provides in pertinent part as follows:

1. It shall be an unlawful discriminatory practice:

(a) For an employer or licensing agency, because of the age, race, creed, color, national origin, sexual orientation, military status, sex, disability, predisposing genetic characteristics, or marital status of any individual, to refuse to hire or employ or to bar or to discharge from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment.

N.Y. Exec. Law § 296(1) (McKinney's 2007). The Court notes that the elements of Title VII and New York Executive Law § 296 claims "can be analyzed, for purposes of deter- mining sufficiency of the evidence, in a manner virtually identical to those under Title VII." *Gallagher v. Delaney*, 139 F.3d 338, 345 (2d Cir. 1998).

### Hostile Work Environment

The Second Circuit addressed the elements of a hostile work environment claim under Title VII in *Schiano v. Quality Payroll Systems, Inc.*, 445 F.3d 597 (2006) as fol- lows:

"When the workplace is permeated with discriminatory intimidation, ridi- cule, and insult [based on, *inter alia*, sex] that is sufficiently severe or per- vasive to alter the conditions of the victim's employment and create an abusive working environment, Title VII is violated." *Harris* [*v. Forklift Sys- tems, Inc.*], 510 U.S. [17] at 21 (internal quotation marks and citations omitted); *see also Alfano v. Costello*, 294 F.3d 365, 373-74 (2d Cir. 2002) (same). A jury must be able to conclude that the work environment both objectively was, and subjectively was perceived by the plaintiff to be, suffi- ciently hostile to alter the conditions of employment for the worse. *Id.*; *see also Feingold v. New York*, 366 F.3d 138, 150 (2d Cir. 2004).

*Schiano*, 445 F.3d at 604-05 (footnote omitted). As the Second Circuit observed in *Mass v. Equinox Fitness Club*, 354 Fed. Appx. 556, 557–58 (2d Cir. 2009):

> As a general rule, it is "axiomatic that in order to establish a sex-based hostile work environment under Title VII, a plaintiff must demonstrate that the conduct occurred because of [his] sex." *Alfano v. Costello*, 294 F.3d 365, 374 (2d Cir. 2002); *accord Brown v. Henderson*, 257 F.3d 246, 252 (2d Cir. 2001) (citing *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 79-80 (1998)). To do so, a plaintiff must present, at a minimum, circumstantial evidence from which a discriminatory intent can be inferred. *See Schiano v. Quality Payroll Systems, Inc.*, 445 F.3d 597, 603 (2d Cir. 2006).

"Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment-an environment that a reasonable person would find hostile or abusive-is beyond Title VII's purview." *Harris v. Forklift Systems, Inc*, 510 U.S. 17, 21 (1993).

### Retaliation

In order to state a claim for Retaliation, a plaintiff must plausibly allege that "(1) [Plaintiff] engaged in a protected activity; (2) the employer was aware of the protected activity; (3) the employer took adverse action; and (4) a causal connection exists between the protected activity and the adverse action." *Shah v. N.Y. State Dept. of Civil Service*, 341 Fed. Appx. 670, 673 (2d Cir. 2009).

### Burden Shifting Analysis

All of Plaintiff's claims are subject to the *McDonnell Douglas*[3] burden shifting analysis. As explained by the Second Circuit in a retaliation context:

> First, the plaintiff must establish a prima facie case…. of retaliation by showing: "'(1) participation in a protected activity; (2) that the defendant knew of the protected activity; (3) an adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action.'" *Jute* [*v. Hamilton Sundstrand Corp.*], 420 F.3d [166] at 173 (quoting *McMenemy v. City of Rochester*, 241 F.3d 279, 282-83 (2d Cir.2001)). The plaintiff's burden in this regard is "de minimis," and "the court's role in evaluating a summary judgment request is to determine only whether proffered admissible evidence would be sufficient to permit a ra-

[3] McDonnell Douglas v. Green, 411 U.S. 792 (1973).

tional finder of fact to infer a retaliatory motive." *Id.* (internal quotation marks omitted).

If the plaintiff sustains this initial burden, "a presumption of retaliation arises." *Id.* The defendant must then "articulate a legitimate, non-retaliatory reason for the adverse employment action." *Id.* If so, "the presumption of retaliation dissipates and the employee must show that retaliation was a substantial reason for the adverse employment action." *Id.* A plaintiff can sustain this burden by proving that "a retaliatory motive played a part in the adverse employment actions…[;] if the employer was motivated by retaliatory animus, Title VII is violated even if there were objectively valid grounds for the [adverse employment action]." *Sumner v. U.S. Postal Serv.*, 899 F.2d 203, 209 (2d Cir.1990).

*Hicks v. Baines*, 593 F.3d 159, 164-165 (2d Cir. 2010). In a subsequent case, the Supreme Court clarified that a plaintiff making a retaliation claim pursuant to 42 U.S.C. § 2000e-3(a)[4] "must establish that his or her protected activity was a but-for cause of the alleged adverse action by the employer." *Univ. of Tex. Southwestern Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2534 (2013).

## ANALYSIS

### *Yost's Motion*

Yost seeks judgment for himself on all the causes of action in the complaint pertaining to him, which he argues includes an allegation of aiding and abetting gender discrimination and retaliation in violation of Title VII and the NYSHRL.

A plaintiff has a three-year period in which to bring claims under the NYSHRL. *Koerner v. State*, 62 N.Y.2d 442, 446 (1984) ("the institution of a civil action to recover damages pursuant to the Human Rights Law for discriminatory discharge by a private employer is governed by the three-year Statute of Limitations contained in CPLR 214 (subd 2)"). As this Court has previously observed:

There is disagreement among courts in this Circuit as to whether state-law

---

[4] "Discrimination for making charges, testifying, assisting, or participating in enforcement proceedings."

limitations periods are tolled by the filing of an EEOC complaint. The majority view, though, among district courts, which has also been stated by a Second Circuit panel in an unpublished decision, is that state-law limitations periods are *not* tolled by the filing of an EEOC complaint. *See, Ashjari v. Nynex Corp.,* No. 98–9411, 182 F.3d 898, 1999 WL 464977 at *1 (2d Cir. Jun. 22, 1999) (unpublished) ("[A]n EEOC charge does not toll the time for state law claims arising from the same events.") (citing *Johnson v. Railway Express Agency, Inc.,* 421 U.S. 454, 465–66, 95 S. Ct. 1716, 44 L.Ed.2d 295 (1975), other citation omitted).

*Carlson v. Geneva City Sch. Dist.*, 679 F. Supp. 2d 355, 370-71 (W.D.N.Y. 2010); *see also Cornish v. District of Columbia*, 67 F. Supp. 3d 345, 372 (D.C. 2014) ("state law claims are not tolled during the EEOC process"); *Smith v. Tuckahoe Union Free Sch. Dist.*, No. 03 Civ. 7951 (PGG), 2009 U.S. Dist. LEXIS 91106 (S.D.N.Y. Sept. 30, 2009) ("the overwhelming weight of authority is that the filing of an EEOC charge does not toll the statute of limitations"); *Pasqualini v. MortgageIT, Inc.*, 498 F. Supp. 2d 659, 668 (S.D.N.Y. 2007) (same); *but see Sloth v. Constellation Brands, Inc.*, 883 F. Supp. 2d 359, 373 n.5 (W.D.N.Y. 2012) ("by statute, state Human Rights law claims are tolled by the filing of an administrative complaint with the New York State Division of Human Rights, N.Y. Exec. L. § 297(9), and courts in this Circuit have extended the tolling period to administrative complaints filed with the EEOC.").

Yost points out an exception to the anti-tolling of NYSHRL claims: where a claim is pending before the New York State Division of Human Rights ("DHR"), the limitations period is tolled. N.Y. C.P.L.R. § 204(a) and N.Y. Exec. Law § 297(9). A claim filed with the EEOC is deemed to be filed before the DHR. *See Sunshine v. Long Island Univ.*, 862 F. Supp. 26, 30 (E.D.N.Y. 1994) ("A charge filed with the EEOC is deemed filed with the State Division."). In his supplemental letter memorandum, Yost argues that Plaintiff's EEOC complaint is construed to have been immediately dismissed from the New York DHR by the waiver in the worksharing agreement. New York Executive Law

§ 297(9) ("(iii) A FEP[5] agency may waive its right to the period of exclusive processing of charges provided under section 706(c) of title VII with respect to any charge or category of charges.") 29 C.F.R. § 1601.13. The situation in *Ford v. Bernard Fineson Development Center*, 81 F.3d 304 (2d Cir. 1996) is instructive:

> We hold that a Worksharing Agreement may contain a self-executing waiver of a state agency's right to exclusively handle discrimination claims for 60 days, and that this waiver may constitute "termination" of state agency proceedings under § 2000e–5(c). This holding is consistent with the rulings of the seven other circuits that have considered this issue, and with the reasoning of the district courts in our Circuit that have unanimously reached the same conclusion. See *Griffin v. City of Dallas*, 26 F.3d 610, 613 (5th Cir.1994); *Worthington v. Union Pacific R.R.*, 948 F.2d 477, 482 (8th Cir.1991); *Marlowe v. Bottarelli*, 938 F.2d 807, 814 (7th Cir.1991); *Trevino–Barton v. Pittsburgh Nat'l Bank*, 919 F.2d 874, 880 (3d Cir.1990); *EEOC v. Techalloy Maryland, Inc.*, 894 F.2d 676, 678 (4th Cir.1990); *Griffin v. Air Prods. and Chemicals, Inc.*, 883 F.2d 940, 943 (11th Cir.1989); *Green v. Los Angeles County Superintendent of Schools*, 883 F.2d 1472, 1479 (9th Cir.1989); *Mayo v. Securities Industry Ass'n*, 1995 WL 608291, *3 (S.D.N.Y.) (Haight, J.); *Humphrey v. Council of Jewish Federations*, 901 F.Supp. 703, 708 (S.D.N.Y.1995) (Batts, J.); *Shumway v. Hendricks*, 1994 WL 672656, *1 (N.D.N.Y.) (Scullin, J.); *Dendy v. Waldorf–Astoria Corp.*, 1993 WL 328833, *2 (S.D.N.Y.) (Preska, J.).

*Ford v. Bernard Fineson Dev. Ctr.*, 81 F.3d 304, 309–11 (2d Cir. 1996).

"The clear intent of [42 U.S.C. § 2000e-5(c)] was to preserve the complainant's right to commence an action in court pursuant to Executive Law § 297(9) even though he or she filed charges or an administrative complaint with the United States Equal Employment Opportunity Commission (hereinafter the EEOC) and the EEOC, in turn, forwarded those charges or that administrative complaint to the SDHR for filing . . . . *Barr*

---

[5] FEP means Fair Employment Practices agency and operates as a reference to the New York State Division of Human Rights. *See McGuirk v. Eastern Gen. Ins. Agency*, 997 F. Supp. 395, 398 (W.D.N.Y. 1998). When Plaintiff filed with the EEOC, her complaint was simultaneously filed with the New York DHR pursuant to 42 U.S.C. § 2000e-5(c), the worksharing agreement between that agency and EEOC, and New York Executive Law § 297(9).

*v. BJ's Wholesale Club, Inc.*, 62 A.D.3d 820, 821, 879 N.Y.S.2d 558 (N.Y. App. Div. 2d Dep't 2009).

Yost also points out that case law indicating that the statute of limitations for the NYHRL claims is tolled is based on the holding in *Matter of Pan Am. World Airways, Inc. v. New York State Human Rights Appeal Board*, 61 N.Y.2d 542 (1984), which has subsequently been rendered moot by the 1991 amendments to New York Executive Law § 297(9) ("A complaint filed by the equal employment opportunity commission to comply with the requirements of 42 USC 2000e–5(c) and 42 USC 12117(a) and 29 USC 633(b) shall not constitute the filing of a complaint within the meaning of this subdivision."). L.1991, ch.342, § 1 (Jul. 15, 1991). Further, having a claim pending before the EEOC does not toll an individual's state tort action limitations period. *See Castagna v. Luceno*, 744 F.3d 254, 258 (2d Cir. 2014) ("We therefore join the Seventh and Ninth Circuits in holding as a matter of federal law that filing an EEOC charge does not toll the time for filing state tort claims, including those that arise out of the same nucleus of facts alleged in the charge of discrimination filed with the EEOC."). Therefore, the only tolling provision that would have been in effect for the state law claims was N.Y. C.P.L.R. § 204(a) ("[w]here the commencement of an action has been stayed by a court or by statutory prohibition, the duration of the stay is not a part of the time within which the action must be commenced").  In that regard, Plaintiff has not shown any stay by a court, or by a statutory prohibition. Consequently, the limitations period for Plaintiff's NYHRL claims expired well before she brought this lawsuit.

In addition, the EEOC complaint, received by the EEOC on September 9, 2008, attached as Exhibit K to the Village motion, [ECF No. 33-22](), does not name Yost in the

Charge of Discrimination. Yost is named in a letter attached to the Charge of Discrimination. The letter names Yost as follows:

> [A]n incident in 2004 when Ms. Cook walked in on ex-Police Chief Donald Yost while he viewed pornography on a station computer. . . .

> Ms. Cook reported the viewing of pornography to a number of officials including former Police Chief Donald Yost. . . .

> Beginning in 2006, Ms. Cook began to endure verbal abuse form ex-Police Chief Donald Yost, whom Ms. Cook charges with referring to her as a "Christ Killer," a "kike," and a "Jew Bitch" on numerous occasions. On October 4, 2006, Yost placed his foot onto the chair where Ms. Cook was sitting. He positioned his foot between her legs so that she could not stand up, then proceeded to berate her using racist and sexist language for approximately twenty minutes. Although ex-Police Chief Yost's conduct may have occurred too long ago to be actionable, it is evidence of the continuing lack of response undertaken by the Village of Painted Post regarding charges of sex discrimination. . . .

> [W]hen Ms. Cook reported Yost's civil assault to Painted Post Mayor Franklin, Yost and the Village of Painted Post came to an agreement whereby he would step down as police chief, but he remained a paid consultant, retained his key and access to the police station, and retained his police scanner. For more than five months he used these tools to engage in a pattern of documented stalking that went unaddressed by the Village. . . .

Letter from P. Adam Militello, Esq. to Elizabeth Cadle, Director, EEOC Buffalo Local Office (Aug. 11, 2008) at 2–3 (attached as Exhibit K to Def.s' Notice of Motion, ECF No. 33-22).

The EEOC issued its decision on February 23, 2012. The period from the filing of the EEOC complaint on September 9, 2008, to the resolution on February 23, 2012, is three years, five months, and two weeks (1,262 days). Subtracting that time from May 21, 2009, the date this lawsuit was filed, means that only the acts that occurred after December 7, 2005, are actionable.

Yost further argues that the EEOC complaint is limited to discrimination that took place within 300 days from the date of filing, and the NYSHRL requires that an administrative complaint be filed within one year of the allegedly discriminatory acts. Looking back from the date the EEOC complaint was filed (September 9, 2008), would mean that any discriminatory acts that took place before November 14, 2007, (300 days) would be barred from a Title VII claim, and any acts that took place prior to September 10, 2007, would be barred from a NYSHRL claim.[6] Even if the Court used the August 11, 2008, EEOC complaint, which was later amended, as the triggering date, the look back period would be October 16, 2007 (300 days), and August 12, 2007 (one year). Plaintiff's EEOC complaint alleges conduct by Yost as late as May 2007 (five months after his retirement), and as early as 2004. None of those alleged acts occurred after the limitations period for an EEOC/NYSHRL charge. Therefore, by failing to bring any EEOC complaint until well after a year from the date of Yost's latest alleged act of discriminatory conduct, Plaintiff has not tolled the NYSHRL limitations period, and any claim under Title VII is barred as against Yost. Moreover, Yost cannot be held personally responsible under Title VII. *Tomka v. Seiler Corp.*, 66 F.3d 1295, 1313 (2d Cir. 1995) ("We now hold that individual defendants with supervisory control over a plaintiff may not be held personally liable under Title VII. Under the HRL, however, the individual defendants may be sued in their personal capacities for the sexual harassment."). The Court concludes, therefore, that Yost is entitled to judgment.

---

[6]The NYSHRL does not require exhaustion of administrative remedies. *Zustovich v. Harvard Maintenance, Inc.*, No. 08 Civ. 6856(HB), 2009 WL 735062, 7 (S.D.N.Y. Mar. 20, 2009).

### The Village's Motion

The Village defendants[7] argue that any acts of discrimination prior to October 16, 2007, are barred under Title VII by the 300-day limitations period for filing a complaint with the EEOC. As the Court previously discussed, the cut-off date for Title VII claims is October 16, 2007. Plaintiff argues three types of allegedly discriminatory acts occurring after that date: (1) not being granted overtime; (2) pornography being viewed on department computers; and (3) being disciplined when her male colleagues were not. The Court will address each of these areas.

### Overtime Pay

With regard to not being granted overtime, Plaintiff identified Colonial Days as a time when she thought officers were entitled to mandatory overtime. On that issue, Plaintiff at deposition was asked the following questions and gave the following answers:

> Q. Okay. And did there come a time where the amount of overtime you were receiving changed?
>
> A. Yes.
>
> Q. Okay. And when was that?
>
> A. In 2008.
>
> Q. Now, how did it change?
>
> A. I wasn't being called or wasn't being offered hours. And there were certain things each year that we had mandatory overtime hours, such as Colonial Days, which is an annual parade and fair we have in the Village. And there was a sign-up sheet for hours and you're allowed to sign-up by seniority usually and then what's left over, everybody else being a part-timer can fill in.
>
> Q. Okay.

---

[7] With respect to the Title VII claims, the Court considers that only the Village of Painted Post is a defendant. Only under the NYSHRL can the individuals named be defendants.

A. And they signed everybody up before I had the chance to sign up. I believe it coincided with me being away, but I had requested to sign-up for certain shifts and nobody put me down and I was not given any shifts at all, other than the standard parade, which we—every person is mandated to work.

Q. Okay. So prior to 2008, on average per month, how much overtime would you typically get?

A. I would say at least a—normally a shift a week, sometimes more.

Q. So about eight hours then?

A. (Witness nods head)

Q. I'm sorry, verbal.

A. Approximately four to eight hours.

Q. Okay. And in 2008, you're saying that decreased then, correct?

A. Yes.

Q. Okay. And on average in 2008, how many hours of OT would you get a month?

A. I don't know exactly, maybe a shift a month.

Q. And did you ever discuss this change in OT with anyone in Painted Post?

A. I complained about it, I think, to Todd and to Chief Halm.

Q. Did they give you any response or explanation?

     MS. BOSMAN: Objection. Form. You can answer.

A. I think Todd Kimmey said it's not—I don't really know anything about it because he was working in the school at the time. He was an SRO, so he wasn't in the office as much, so—

Q. Now, SRO is—

A. School Resource Officer.

Q. Thank you.

A. Although, when it came to Colonial Days, at that time, he's on summer break, which means he starts working the regular PD hours. So when it

came to Colonial Days, he was aware of it. I don't know—I don't think they really cared.

Kibmall Dep. 181:19–183:25, Apr. 27, 2015, ECF No. 42-2. Defendants refer to Chief Hahn's deposition testimony, in which he was asked the following questions, and gave the following answers:

> Q.·Did Ms. Cook work overtime or special duty on the Colonial Days event?
>
> A. I believe she did, yes.
>
> Q. Was she excluded from working on that event during the time that you were chief?
>
> > MR. HOURIHAN: Form.
>
> A. No.
>
> Q. Was she excluded from working that event during the time Chief Yost was chief?
>
> A. Not that I recall, no.
>
> Q. Was that event staffed by the Painted Post Police Department based upon seniority?
>
> A. No, it was not.
>
> Q. What was it based upon?
>
> A. Because I had considered this somewhat outside employment. What I would do is post the times of the available shifts and whoever wanted them, whoever was available to fill them, would sign up for that particular shift.
>
> Q. So it was kind of like a first-come first-serve situation?
>
> A. Correct.

Halm Dep. 197:23–198:20, Apr. 28, 2015, ECF No. 44. Plaintiff has failed to raise a material issue of fact with regard to whether she was denied overtime pay, and Defendants have shown their entitlement to judgment on this issue.

**Pay Disparity**

With regard to Plaintiff's complaint that she received less pay than her male counterparts, the Village relies on a General Release Plaintiff signed on May 13, 2008, ECF No. 33-23. In exchange for a payment of $1,250.00, she agreed to release the Village of Painted Post "on account of past claims for wages, and benefits as a village employee, whether contractual or not," and acknowledged that her full-time starting date was May 12, 2005. Plaintiff now attacks that General Release, arguing that she was under the influence of medication when she signed it. Although Plaintiff asserted she drove directly from her hospital discharge to Painted Post to sign the release, Defendants have provided evidentiary proof of her discharge, which was on May 8, 2008, five days prior to signing the General Release. Further, Plaintiff has provided no proof that she ever returned the money in her attempt to rescind the General Release. As U.S. Magistrate Judge Jonathan W. Feldman of this Court identified:

> Where the totality of circumstances surrounding how the release was obtained demonstrates that it was not a knowing and voluntary decision because of duress, coercion or fraudulent misrepresentations by the employer, the release is not void, but voidable. The distinction between a void release and a voidable release is important. Where a release is voidable, once the employee is cognizant of the alleged defect and has a reasonable opportunity to reject or challenge the release, the employee's subsequent decision to keep the consideration despite the defect operates to ratify the release.

*Davis v. Eastman Kodak Co.*, No. 04-CV-6098, 2007 U.S. Dist. LEXIS 23193 (W.D.N.Y. Mar. 29, 2007). Plaintiff has failed to raise a material issue of fact concerning the release's validity, and the release settled her claims of unequal pay. Therefore, Defendants are entitled to judgment on this point.

*Pornography*

Plaintiff asserts that she was subjected to observing pornography on the department's computers. Specifically, she testified at her deposition giving the following answers to the following questions:

> Q. Okay. Now, how did you first come to believe there was pornography being viewed on those computers?
>
> A. Because it was left open, shrunken down on the toolbar of the computer.…
>
> A. I saw it many times.
>
> Q. Okay. And would you see it in the same fashion, minimized in the toolbar?
>
> A. Not always, no.
>
> Q. What other ways would you see it?
>
> A. When you would go to go in the search bar to type something in, it would autopopulate [phon] and it would bring up the websites that had been typed in, and in the computer history.
>
> Q. So you would view the computer history and see pornography sites in there?
>
> A. Yes.

Plaintiff Dep. 112:14–17; 113:23–114:10. She also testified that she "had seen inappropriate photos from Chief Yost." *Id*. 114:22–23. She did not, however, see anyone else viewing pornography. *Id*. 116:7–11. Plaintiff was unable to recall when first she saw the pornography, stating only that she saw it "multiple times throughout the years." *Id*. 116:21–23; 117:15. She complained to the mayor sometime in the fall or winter of 2006. *Id*. 118:19–21.

Plaintiff admitted during her deposition that Halm issued an inter-office memorandum concerning appropriate computer usage dated February 23, 2007. Plaintiff Dep.

123:10–15; 124:9–19. Plaintiff testified that it was her belief the random memo was written after her complaint to the district attorney. *Id.* 125:19–25. Plaintiff testified that she saw pornography on the department's computers after that memorandum, but did not complain to Halm; she could not recall any dates. *Id.* 126:2–12. On May 28, 2008, Halm issued another memorandum about computer usage, and restricted access by instituting passwords. Plaintiff Dep. 128:15–131:12. Plaintiff stated she received a password, and used the department computers for report writing, eBay, emailing friends, shopping, and taking online training. *Id.* 133:16–24.

Defendants provided copies of several memoranda Halm issued to all patrol personnel concerning improper usage of the computers. The dates on the memoranda are: February 23, 2007; May 28, 2008; and May 29, 2008. Hourhan Aff. Ex. N, Mar. 2, 2015, ECF No. 33-25.

Defendants cite to *Dotson v. City of Syracuse*, No. 5:04-CV-1388 (NAM/GJD), 2009 U.S. Dist. LEXIS 62174 (N.D.N.Y. Jul. 21, 2009) in support of their argument that the pornography on display in this case is not sufficient to create a hostile working environment. In *Dotson*, the district court observed that pornography was viewed by the plaintiff, a community service officer in the city police department, on two occasions. The district court concluded that "[w]ith regard to pornography, a review of the record reveals that the incidents were infrequent and isolated. The record establishes that plaintiff saw pornography at the SPD on two occasions over a five to six month period.… Moreover, plaintiff has failed to present evidence to demonstrate how the conduct interfered with her work performance. Based upon the record, no reasonable factfinder

could conclude that these two events were severe or pervasive to constitute a hostile work environment." *Dotson*, 2009 U.S. Dist. LEXIS 62174, *44–45.

Plaintiff did not describe the "inappropriate" pictures, and only saw them when Yost was viewing them on his computer. At all other times, Plaintiff saw minimized indications of pornography, and records in the computer's history when she was searching. Plaintiff has not presented evidence as to how these instances interfered with her work, nor has she presented evidence that the viewing of pornography was severe and pervasive enough to create a hostile work environment.

### Disciplinary Actions

Plaintiff relates factual allegations concerning a disciplinary action taken against her. The first was the discipline she received for leaving a fork in a patrol car on or about the end of 2007, or the beginning of 2008. Plaintiff Dep. 47:22–23. Plaintiff acknowledged the safety aspect of leaving a fork in a patrol car on the floor where it could slip into the area holding a prisoner, but felt that "that they were rather harsh about something that was accidental that I wasn't aware of and they wouldn't even have even known if I didn't say something." *Id*. 50:11–14. She labeled the reprimand as "harassing." *Id*. 50:17. She also testified that "I believe that they docked me a vacation day or something…." *Id*. 50:22–23. She complained to the union representative, but did not ask him to do anything about the reprimand. *Id*. 51:17–20. Further, Plaintiff claims that when, in the spring of 2008, she found a knife belonging to Swan in a patrol car, she turned it in, or notified the Chief about it. *Id*. 51:23–52:17; 53:2. She claims the Chief did nothing about it until sometime later. *Id*. 52:19–22.

In his reply affidavit, Halm stated that during his time as Chief (January 1, 2007, until August 28, 2014), he issued many written reprimands, but never docked any of-

ficer's vacation time and specifically did not dock Plaintiff any vacation time for leaving a fork in a patrol vehicle. Halm Reply Aff. ¶¶ 2–3, May 13, 2015, ECF No. 48-1. Further, Halm stated that he disciplined Swan "in the same exact fashion" that he disciplined Plaintiff for leaving an object in a patrol car, issuing a counseling memorandum to Swan on or about May 30, 2008. *Id.* ¶ 4; Counseling Memorandum (May 30, 2008), attached as Ex. 7 to Bosman Aff., Apr. 27, 2015, ECF No. 40.

### Hiring of a Sergeant

Plaintiff also raises the hiring of Gregory Fonseca ("Fonseca") as a sergeant in the department. Plaintiff points out that prior to Fonseca's hiring, there was no sergeant position in the department and that she was not given the opportunity to apply for the position, or take an examination to qualify for it. Halm stated in his reply affidavit that he hired Fonseca "as a lateral transfer from the Steuben County Sheriff's Department where he also held the position of Sergeant. No officers from the Painted Post Police Department were considered for the position of Sergeant." Halm Reply Aff. ¶ 5. Hiring Fonseca did not affect Plaintiff's pay or position. Because the position was not offered to any member of the department, the Court fails to see how hiring Fonseca equates to an adverse act against Plaintiff. Nevertheless, the hiring took place on March 23, 2007, well prior to the 300-day period discussed above.

### Constructive Discharge

Plaintiff contends that she was constructively discharged which she argues is an adverse employment action. The basis for her contention is that Yost harassed her when he was the Chief of Police, and after he left the department, continued to harass her, which the then-Chief failed to prevent.

The Second Circuit addressed the conditions under which a constructive discharge will be recognized in *Lopez v. S.B. Thomas, Inc.*, 831 F.2d 1184 (2d Cir. 1987), writing:

> "A constructive discharge occurs when the employer, rather than acting directly, 'deliberately makes an employee's working conditions so intolerable that the employee is forced into an involuntary resignation.'" *Id.* (quoting *Young v. Southwestern Sav. and Loan Ass'n*, 509 F.2d 140, 144 (5th Cir. 1975)). To find that an employee's resignation amounted to a constructive discharge, "'the trier of fact must be satisfied that the . . . working conditions would have been so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign.'" *Id.* (quoting *Alicea Rosado v. Garcia Santiago*, 562 F.2d 114, 119 (1st Cir. 1977)).

*Lopez*, 831 F.2d at 1188.

Plaintiff testified at her deposition that when she began working full time for the department she had a good working relationship with Yost and enjoyed working for him. Plaintiff Dep. 142:9–16. She testified that Yost's "behavior towards [her] had started to change" around Christmas in 2005. *Id.* 144:23–145:2. Yost, she said, became "moody, grumpy, volatile, vulgar [and] offensive." *Id.* 145:5–6. She began complaining about him in the summer of 2006. *Id.* 146:4–5. She related how Yost assaulted her, and harassed her when he was both on duty and off duty. She testified that after he was no longer Chief, sometime in 2007, she saw him again in the department smoking and sitting at the front desk. Plaintiff Dep. 173:6–15. She testified that she saw him "[p]retty much daily" in the department in 2007. *Id.* 174:13–14. Once the locks were changed, she stopped seeing Yost there. *Id.* 174:16–22; 195:19–23. She did not recall when the locks were changed, but thought it was around March 2007. *Id.* 174:20–25; 175:3–4. The last time Plaintiff had any verbal interaction with Yost was the spring of 2007. *Id.* 194:17–25. Plaintiff was asked about any interactions she had with Yost subsequent to spring of 2007 and responded as follows:

A. I had numerous occasions when I'm working 3:00 to 11:00 or 11:00 to 7:00 and he would be in a park that was closed to vehicular traffic from 10:00 p.m. on and he would be in there letting his dog poop, even though he's not supposed to. And it's one of our Village codes that we're supposed to go and enforce that people are not in this park and vehicles. He would go in every night. He would drive by me on vehicle stops even at 1:30, 2:00, 3:00 in the morning, approximately, very slowly and stare at me and make faces at me. I called it into 911 more than once and reported his vehicle plate. I would have him follow me on duty and off duty. Wal-Mart in Watkins Glen, Wal-Mart in Elmira, Corning, Elmira, I would see him. He would drive around my house. My house was in a little block where the Sunoco station was. My house, another house and McDonald's, and—so you could circle around. I would see him in parking lots across the street from my house, the next to the church. I would see him on calls. I'd go to a house—an EMS call, back up, whatever, he would drive by. I saw him constantly.

Q. Okay. During these occasions, was there any type of verbal interaction with him?

A. No.

Plaintiff Dep. 199:20–200:22.

Plaintiff characterizes Yost's actions as adverse employment actions. Looking at the 300-day period, the actions described by Plaintiff above evidently occurred prior to November 4, 2007. Further, despite what she characterizes as Yost's continual harassment, which she attributes in part to the then-Chief, Plaintiff did not resign her position until June 25, 2008. The following month she took up a new and entirely more financially rewarding position. Plaintiff's evidentiary proof fails to raise an issue of fact concerning her departure from the department. The very fact that she remained on duty through June of the year following what she described as harassment by Yost, and the failure to introduce evidentiary proof in admissible form that the department sanctioned Yost's actions cut against her argument she was constructively discharged. Instead, the proof presented on the pending motion shows she left for a better position, not because

of Yost's actions, or because of the failure of the department to prevent Yost from fol-

lowing her on the job.

## CONCLUSION

For all of the foregoing reasons, the Court grants Defendants' motions for sum-

mary judgment, ECF No. 32 and ECF No. 33. The Clerk is directed to enter judgment

for Defendants and close this case.

IT IS SO ORDERED

Dated:   August 19, 2016
         Rochester, New York

ENTER:

/s/ Charles J. Siragusa
CHARLES J. SIRAGUSA
United States District Judge